**N.B.A. CREDIT UNION, INC., Plaintiff,**

v.

**Sarah W. HARGROVE,
et al., Defendants.**

No. 93–4826.

United States District Court,
E.D. Pennsylvania.

Oct. 14, 1993.

James A. Backstrom, North & Vaira, Philadelphia, PA, for plaintiff.

Sue Ann Unger, Office of Atty. Gen., Philadelphia, PA, for Sarah W. Hargrove.

Richard Mentzinger, Jr., Office of U.S. Atty., Philadelphia, PA, Margaret H. Plank, Dept. of Justice, Washington, DC, for Roger W. Jepsen.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

KATZ, District Judge.

### PARTIES

1. Plaintiff N.B.A. Credit Union, Inc. ("Credit Union") is a non-profit Pennsylvania corporation chartered and regulated by the Pennsylvania Department of Banking ("Department").

2. Credit Union is comprised of a group that has a common bond of association through membership in the National Business Association, Inc. ("NBA"), a voluntary association of private and public employers and employees.

3. Defendant Sarah W. Hargrove ("Hargrove") is the Secretary of Banking of the Commonwealth of Pennsylvania, with responsibility for administration of the Department, including regulation of Pennsylvania-chartered credit unions. 17 Pa.C.S.A. §§ 101–1504.

4. The National Credit Union Administration ("NCUA") is an independent agency in the executive branch of the federal government, 12 U.S.C. § 1752a. Defendant Roger W. Jepsen ("Jepsen") is the appointed chairman of NCUA.

5. Credit Union is a federally-insured credit union subject to examination, supervision and regulation by the NCUA. 12 U.S.C. § 1752(7); 12 U.S.C. §§ 1784, 1786.

### FIELD OF MEMBERSHIP DISPUTE

6. Pennsylvania chartered credit unions are permitted to accept and service members in accordance with Pennsylvania Law. Pursuant to 17 Pa.C.S.A. § 701 the Department has the duty to regulate membership of Pennsylvania chartered credit unions.

7. Credit Union was chartered on February 3, 1972 as D.V.B.A. Credit Union and was then sponsored by the Delaware Valley Business Association. Credit Union assumed its present name on October 31, 1986, reflecting the change in its sponsor. At that time, its field of membership was expanded to include all members of NBA. Pl.Ex. 1–4.

8. As of March 1990, Credit Union provided services to employer groups in approximately forty (40) states. Pl.Ex. 29, p. 1.

9. In September of 1990 it became apparent to Credit Union and Department that their respective views of Credit Union's authorized field of membership differed. Pl. Ex. 5, 30, p. 2.

10. Specifically, in September of 1990, Credit Union was operating under the view that its field of membership was constrained by Article 8 of its Amended Articles of Incorporation which reads in its entirety:

> The membership of the credit union will be limited to: Members of the National Business Association; associations of such persons; employees of the credit union; retired members who retain their membership in the credit union; and members of their immediate families.

Pl.Ex. 4. Department was operating under the view that "Pennsylvania State Chartered Credit Unions are restricted in membership to common associational groups within well defined community or rural districts in Pennsylvania." Pl.Ex. 5.

11. Several discussions between NCUA, Department and Credit Union concerning Credit Union's field of membership culminated in a meeting on April 18, 1991, between the Credit Union Board of Directors, Mary D. France, then Deputy Chief Counsel for the Department, Victor H. Seesholtz, Pennsylvania Bureau of Supervision and Enforcement, and representatives of NCUA.

12. At the April 18, 1991 meeting, the Department presented a draft Cease and Desist Order (the "Order") to Credit Union. The Order addressed the disagreement over Credit Union's field of membership. Credit Union suggested changes to the Order and the Department agreed to some modifications.

13. On April 29, 1991, the Department mailed to Credit Union a copy of the Order which memorialized the modifications agreed to at the April 18, 1991 meeting.

14. On May 21, 1991, the Department received a joint Stipulation and Consent to Entry of Order to Cease and Desist ("Stipu-

lation"), signed by Department and Credit Union, and dated April 18, 1991.

15. The paragraph of the Order pertaining to Credit Union's field of membership ("Field Definition") reads in its entirety:

The Credit Union shall limit its field of membership to members of NBA in the following geographic locations:

(a) the counties of Bucks, Chester, Philadelphia, Delaware and Montgomery, or elsewhere in the Commonwealth of Pennsylvania if prior authorization is granted by the Department pursuant to the requirements of Section 701(a) of the Code.

(b) the counties of Camden, Mercer, Gloucester and Burlington in the State of New Jersey, if prior authorization is obtained from the New Jersey Department of Banking; and

(c) the State of Delaware north of the Delaware Canal, if prior approval is obtained from the appropriate state agency.

All individual members of the Credit Union and all business/employer members of the Credit Union enrolled as of May 1, 1991, not within the above described field of membership may remain members of the credit union if not in violation of the law of the state in which the member is located. No new employee members employed by existing business/employer members located outside the Commonwealth of Pennsylvania may be admitted to membership after May 1, 1991. No new business/employer members outside the field of membership may be admitted to membership after April 18, 1991.

Stipulation Ex. C.[1]

16. The present controversy centers on (a) the parties' differing interpretations of the Field Definition and (b) the parties' differing views regarding refinement or modification of the Field Definition by (i) discussions between the parties subsequent to the Stipulation and (ii) discussions between

Credit Union and New Jersey regulators. Complaint ¶¶ 18–20, 34–45.

17. Specifically, the dispute is over the ability of New Jersey business/employer groups to enroll new members in Credit Union.

18. Credit Union maintains that the Order is ambiguous. In particular, Credit Union claims the phrase (the "Disputed Phrase"), "No new employee members employed by existing business/employer members located outside the Commonwealth of Pennsylvania may be admitted to membership after May 1, 1991," is inconsistent with provision (b) of the Field Definition which permits Credit Union to operate in four New Jersey counties (the "Four Counties").

19. Credit Union has operated under the assumption that the Disputed Phrase was not intended as a limit on Credit Union's authority, but rather an expression of what Department could authorize without infringing on New Jersey's regulatory authority.

20. Credit Union asserts that the validity of this assumption was confirmed by the Department.

21. Credit Union received a letter on August 8, 1991 from the New Jersey Department of Banking forbidding Credit Union from taking on "any new employee groups from the State of New Jersey," and permitting Credit Union to "service existing employees throughout the State of New Jersey who are members of NBA, Inc. This also includes adding new employees from the existing employee groups." Pl.Ex. 17.

22. After Credit Union received this information from the New Jersey Department of Banking, Credit Union considered its authorized field of operation to include New Jersey applicants from the following groups:

a) Employees of business/employer members located in Pennsylvania or the Four Counties ("Group 1"); and

b) Employees of business/employer members located in New Jersey and outside the Four Counties who were enrolled members of Credit Union as of May 1,

---

1. Credit Union contends that the phrase, "if not in violation of the law of the state in which the member is located," was unilaterally inserted by Department and was not agreed to at the April 18, 1991 meeting.

1991 and were admitted to membership prior to April 19, 1991 ("Group 2").

23. Credit Union maintains that it informed Department of this policy (considering eligible for membership all New Jersey applicants who were employees of legitimately serviced [2] New Jersey business/employer groups).

24. Credit Union claims this policy was authorized by Department examiners.

25. This policy resulted in the admission of new members from outside Pennsylvania and the Four Counties.

26. In April of 1993, Credit Union received a report of examination from Department that stated, in part:

> #4 *Field of Membership*—A comprehensive review of approximately 4,000 membership cards revealed that the credit union is still accepting new members of existing employer groups in the entire state of New Jersey. During the examination, approximately fifty new accounts were found to be apparent violations of this section of the Order. Management believes it is in compliance based on its interpretation of the transcript of the meeting when the original Order was signed combined with the letter from the New Jersey Department of Banking of August 9, 1991, .... The [Department] limits the field of membership in New Jersey to the four counties of Camden, Mercer, Gloucester, and Burlington. This issue is unresolved as of the examination, and the remaining interpretational differences must be clarified and compliance requirements formalized in writing.

Pl.Ex. 23.

27. By letter of July 26, 1993, Department informed Credit Union that it was in non-compliance with the Order. Specifically, the Department asserted that the Order prohibits the enrollment of:

  a) "new members who live outside Pennsylvania or the four [New Jersey] counties;" and

  b) "new employee members employed by existing business/employer members located outside the Commonwealth."

Stipulation Ex. I.

28. The Department's letter of July 26, 1993 incorporates the Disputed Phrase which appears, on its face, to prohibit the acceptance of new members from the business/employer groups in the Four Counties.

29. The reference in the Disputed Phrase to employers "outside of the Commonwealth" was never meant to apply to New Jersey employers in the four New Jersey counties. Pl.Ex. 28, 30. *See also* Department Proposed Findings of Fact ¶ 36–38, 40; NCUA Proposed Findings of Fact ¶ 12.

30. More specifically, the present record establishes that Credit Union has accepted New Jersey applicants who work for employers located outside Pennsylvania and the Four Counties. The Department's position is that these Group 2 applicants are not eligible for membership under the Order.

31. The Department has informed Credit Union that approximately 1900 individuals (the "Unauthorized Individuals") served by Credit Union are not within its authorized field of membership.[3]

32. Since July 30, 1993, Credit Union has returned all applications for membership from New Jersey employer groups outside the Four Counties.

## FEDERAL INSURANCE AND NOTIFICATION OF NON–INSURED

33. The Department's letter of July 26, 1993, also contained the following statement with regard to federal insurance:

---

2. It is not disputed that under the Order Credit Union was permitted to: (a) fully service all New Jersey business/employer groups in the Four Counties; and (b) service the existing members of those New Jersey business/employer groups outside the Four Counties that were serviced by Credit Union on May 1, 1991 and were admitted to membership prior to April 19, 1991, subject to approval by the New Jersey Department of Banking.

3. The Department's position is that current employer location is the only factor to be considered in determining applicant eligibility. In other words, the applicant's residence is irrelevant. Credit Union argues that an employer's former location and applicant residence should be considered in determining eligibility.

Deposits received from members outside the field of membership are non-member deposits and consequently are not insured by the National Credit Union Share Insurance Fund. Thus, any losses incurred by the acceptance of non-member deposits are uninsured, which creates significant liability for the Credit Union as well as individual liability for the Board of Directors.

*Id.*

34. By letter of August 19, 1993, the NCUA informed Credit Union that deposits of new members outside Credit Union's authorized field of membership are not federally insured by the National Credit Union Share Insurance Fund.

35. The August 19, 1993 letter also stated NCUA's intent to notify the individuals involved of the uninsured status of their shares.[4]

36. Credit Union moved this court to grant a preliminary injunction prohibiting Department and the NCUA from taking any action affecting or related to the membership status of employees or employer groups currently served by Credit Union and from withdrawing or interfering with the federal insurance of deposits in Credit Union.

37. Credit Union sent a letter to each of the Unauthorized Individuals on September 3, 1993 informing them that "Credit Union may not be able to maintain you as a member and to provide your Credit Union accounts with Federal Insurance through the National Credit Union Administration." NCUA Supplemental Memorandum.

38. On September 3, 1993 Credit Union also dispatched a letter to New Jersey NBA business/employer members located outside the Four Counties informing them that "at the present time, we can no longer enroll your employees in the Credit Union." The letter also informs these New Jersey business/employer members of the contents of the September 3, 1993 letter from Credit Union to the Unauthorized Individuals. *Id.*

4. NCUA agreed to refrain from notifying these individuals until Credit Union's preliminary in-

## CLAIMS AND DEFENSES

39. Credit Union claims, on its own behalf and on behalf of its members, that the actions of Department and NCUA constitute a violation of:

(a) Due Process under the Fifth and Fourteenth Amendments of the Constitution of the United States and under Article V, Section 9 of the Pennsylvania Constitution. Complaint ¶¶ 58–64;

(b) the liberty and property interests guaranteed by the Fifth and Fourteenth Amendments of the Constitution of the United States and under Article V, § 9 of the Pennsylvania Constitution. *Id.* ¶¶ 65–67;

(c) the Commerce Clause, Art. I, § 8, Clause 3 of the United States Constitution. *Id.* ¶¶ 68–75;

(d) the Privileges and Immunities Clause of Art. IV, § 2 of the Constitution of the United States. *Id.* ¶¶ 76–80; and

(e) Pennsylvania state law. *Id.* ¶¶ 81–84.

40. Pennsylvania has responded by claiming that:

(a) The Order became a final adjudication when Credit Union did not appeal it pursuant to 17 Pa.C.S.A. § 503(c);

(b) The court should abstain from considering Credit Union's constitutional claims under the *Burford* doctrine;

(c) Credit Union lacks standing to represent the Unauthorized Individuals;

(d) Credit Union cannot establish the necessary conditions for a preliminary injunction; and

(e) Credit Union's state law claims are barred by the Eleventh Amendment of the United States Constitution.

41. In addition to the defenses set forth by Pennsylvania, NCUA asserts:

NCUA regulations provide a review and appeal process for shareholders whose shares are adjudged to be uninsured. NCUA has not made a final adjudication on the status of the disputed Credit Union accounts. Therefore, there has not been

junction request has been ruled upon.

any final reviewable agency action and this matter is not ripe for resolution.

## ABSTENTION

■ Pennsylvania contends that the court should refrain from considering Credit Union's claims under the *Burford* and *Pullman* abstention doctrines. *See New Orleans Public Service, Inc. v. Council of New Orleans*, 491 U.S. 350, 109 S.Ct. 2506, 105 L.Ed.2d 298 (1989) (citing *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943)); *Railroad Comm'n of Texas v. Pullman*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941).[5]

There are some classes of cases in which federal courts should withhold authorized equitable relief to avoid undue interference with state proceedings because it is "the normal thing to do." *New Orleans Public*, 491 U.S. at 359, 109 S.Ct. at 2513 (citing *Younger v. Harris*, 401 U.S. 37, 45, 91 S.Ct. 746, 751, 27 L.Ed.2d 669 (1971)). However, the areas in which abstention is appropriate have been carefully defined, and abstention "remains the exception, not the rule." *Id.* (citations omitted). Abstention is not appropriate in this action.

The *Burford* doctrine establishes:

Where timely and adequate state-court review is available, a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies: (1) when there are difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar; or (2) where the exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.

*New Orleans Public*, 491 U.S. at 361, 109 S.Ct. at 2514 (citing *Colorado River Water*

*Conservation Dist. v. United States*, 424 U.S. 800, 814, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976)). Here, Pennsylvania's position is that the state administrative process is complete. Specifically, the Commonwealth asserts that the Order became a final adjudication when Credit Union did not appeal pursuant to 17 Pa.C.S.A. § 503(c). Pa. Proposed Conclusions of Law ¶ 9. Thus, the exercise of federal equitable jurisdiction by this court would not interfere with state administrative process. *Burford* abstention is not appropriate. *Id.*, 491 U.S. at 361–363, 109 S.Ct. at 2514–2515.[6]

■ Where state law is uncertain and a clarification of state law might make a federal court's determination of a constitutional question unnecessary, *Pullman* requires the federal court to abstain until a state court has had an opportunity to resolve the uncertainty as to state law. *Pullman*, 312 U.S. at 501, 61 S.Ct. at 645.

Currently, while there is significant ambiguity in the applicability of settled state law to the murky "agreement" of the parties, there is no assertion that the viability of Credit Union's federal claims turns on this court's interpretation of unresolved principles of state law. Proposed Conclusions of Law ¶¶ 9, 10. State law is sufficiently clear for purposes of the preliminary injunctive phase of this case. Therefore, *Pullman* abstention is not presently appropriate.

## PRELIMINARY INJUNCTION

### I. Legal Standard

■ In order to support a preliminary injunction, plaintiff must show both a likelihood of success on the merits and a probability of irreparable harm. *Bradley v. Pittsburgh Bd. of Educ.*, 910 F.2d 1172, 1175 (3d Cir.1990). Additionally, the effect of the issuance of a preliminary injunction on other interested persons and the public interest must be considered. *Id.* Furthermore, a showing of irreparable harm is insufficient if the harm

---

**5.** This is an action under the Civil Rights Act of 1871, 42 U.S.C. § 1983. This court has jurisdiction pursuant to 28 U.S.C. § 1331 and 1343.

**6.** Jepsen argues that this matter is not ripe for resolution because NCUA has not made a final adjudication with regard to the insured status of

Credit Union accounts. In this instance, NCUA's actions with regard to Credit Union are dependent upon the actions of Pennsylvania and not federal administrative process. As discussed above, Pennsylvania's administrative process is complete. Therefore, this matter is ripe.

will occur only in the indefinite future; the moving party must make a clear showing of immediate irreparable harm. *Hohe v. Casey*, 868 F.2d 69, 72 (3d Cir.), *cert denied*, 493 U.S. 848, 110 S.Ct. 144, 107 L.Ed.2d 102 (1989).

Credit Union has not demonstrated a likelihood of success on the merits. Additionally, the interests of the Unauthorized Individuals weigh substantially in favor of denying Credit Union's motion for a preliminary injunction.

## II. Standing of Credit Union to Assert Individual's Claims

Credit Union asserts claims on its own behalf and on behalf of its "members". The interests of the Unauthorized Individuals and Credit Union are not coextensive. Credit Union has an interest in retaining the accounts of the Unauthorized Individuals. However, it may be in the Unauthorized Individuals' best interest to forgo their relationship with Credit Union and establish a similar relationship with another financial institution.

Therefore, Credit Union is unlikely to have standing to assert claims on behalf of the Unauthorized Individuals. *See Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977). Thus, at this time, it is unnecessary to consider the merits of Credit Union's claims on behalf of the Unauthorized Individuals. *Bradley*, 910 F.2d 1172.

## III. Likelihood of Success

■ The crux of Credit Union's claims is that Department's current position with regard to the Field Definition contained in the Order differs from the agreement reached when the Stipulation was executed.[7] This claim does not appear to implicate any constitutional concerns.

**7.** Credit Union does not question the fundamental authority of either Department or NCUA to

### A. Procedural Due Process

The predicate for requiring a governmental entity to comply with the rudiments of procedural due process is a determination that some constitutional interest is at stake. *Stana v. School Dist. of City of Pittsburgh*, 775 F.2d 122, 125 (3d Cir.1985). Here, Credit Union claims a property interest in its business association with the Unauthorized Individuals.

■ To have a constitutionally protected property interest, there must be a legitimate claim of entitlement. *Stana*, 775 F.2d at 126. While, a clearly implied promise can give rise to a constitutionally protected property right, *Cornell v. Higginbotham*, 403 U.S. 207, 91 S.Ct. 1772, 29 L.Ed.2d 418 (1971), a person must have more than a unilateral expectation that such an entitlement exists. *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). The present record does not establish a clear promise. Rather, there exists an ambiguous cease and desist order to which Credit Union consented and then aggressively construed.

■ An existing governmental rule with a mutually explicit understanding can give to property interests protected by procedural due process. *Stana*, 775 F.2d at 125–126. Here, there is no reasonable likelihood Credit Union could establish such a clear mutual understanding between itself and the state.

In short, plaintiff cannot derive a property right entitled to due process protection from what was likely a simple misunderstanding with Department. The Order made explicit provision for plaintiff's continuing business in the Four Counties. The New Jersey regulatory authority would not agree fully with that provision, but offered another, different opportunity for Credit Union to conduct business in New Jersey. The other, different opportunity—continuing to service new employees of business/employer groups located outside the Four Counties—was not authorized in the Order.

The court can understand the frustrations of Credit Union in dealing with a regulatory

regulate its activity.

bureaucracy in which the only person having any familiarity with its affairs had left the agency. However, Credit Union did not go back to the Pennsylvania regulatory authority to re-negotiate the Order. It simply relied on its own sense of what was just and seized the new opportunity authorized by New Jersey.

A subsequent audit by the Pennsylvania regulator simply missed the issue raised by plaintiff's engaging in New Jersey business which was not authorized by the Order. When the Pennsylvania regulatory eventually focused on what was happening, it objected. The New Jersey opportunity was unauthorized and violated the notion of a geographical core of common membership.

Having never "contracted" with Pennsylvania for the New Jersey opportunity, it is unlikely the plaintiff will prove a property interest derived from negotiations for a consent decree worded against the plaintiff's position, even supplemented by the inadvertence of an auditors failure to pick up plaintiff's aggressive business posture and by casual remarks in the negotiations leading to the consent decree.

Since Credit Union is unlikely to establish a constitutionally protected property right, its due process claim is unlikely to succeed.[8]

### B. Substantive Due Process

■ Regulations do not violate substantive due process if they are rationally related to a legitimate state interest. *Midnight Sessions Ltd. v. City of Philadelphia*, 945 F.2d 667, 682 (3d Cir.1991). Substantive due process protects solely against government actions that are not within the legitimate purview of the state's power. *Sinaloa Lake Owners Ass'n v. City of Simi Valley*, 882 F.2d 1398, 1409 (9th Cir.), *cert. denied*, 494 U.S. 1016, 110 S.Ct. 1317, 108 L.Ed.2d 493 (1990). Department has the power to define Credit Union's field of operation. 17 Pa.C.S.A. § 701. NCUA has no authority to insure accounts outside Credit Union's field of operation. 12 U.S.C. § 1781. Therefore, to prevail, Credit Union must establish that the

Department's regulation of Credit Union's field of operation bears no rational relation to a legitimate state interest. Credit Union is unlikely to succeed in proving this contention.

### C. Commerce Clause

■ State laws that unreasonably burden interstate commerce are at odds with the commerce clause, U.S. Const., Art. I, Sec. 8. *See Lewis v. BT Investment Managers, Inc.*, 447 U.S. 27, 36, 100 S.Ct. 2009, 2015, 64 L.Ed.2d 702 (1980). However, so long as a state regulates even-handedly to effectuate a legitimate local public interest, and the effects on interstate commerce are incidental, its regulation will be valid, unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970).

It is unlikely that Credit Union can establish that the Department's regulation of credit union eligibility unreasonably burdens interstate commerce.

### D. Privileges and Immunities Clause

■ The privileges and immunities clause, U.S. Const., Art. IV, Sec. 2, was designed to ensure to a citizen of State A, who is subject to the regulation of State B, the same privileges that the citizens of State B enjoy. *See e.g., Toomer v. Witsell*, 334 U.S. 385, 395, 68 S.Ct. 1156, 1161, 92 L.Ed. 1460 (1948). There is no question that individuals inside Credit Union's authorized field of operation are treated similarly and without regard to their state citizenship. Likewise, there is no question that individuals outside Credit Union's authorized field of operation are treated similarly and without regard to their state citizenship. Therefore, it is unlikely that Credit Union can establish a violation of the privileges and immunities clause.

### E. State Law

It is likely that the Eleventh Amendment of the United States Constitution bars this

---

**8.** Credit Union also claims a liberty interest in its business association with the Unauthorized Individuals. Again, an ambiguous cease and desist order cannot give rise to a constitutionally protected liberty interest. *See Roth* 408 U.S. at 572–576.

854

court's jurisdiction over Credit Union's state law claims. *Pennhurst State School and Hospital v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). Credit Union's state law claims are not likely to succeed.

*IV. Third Party Interests*

Based on the September 3, 1993 letter dispatched by Credit Union to the Unauthorized Individuals, the Unauthorized Individuals believe their deposits *may not* be insured. NCUA believes that their deposits *are not* insured. A grant of injunctive relief would prevent the Unauthorized Individuals from knowing the stance of NCUA and Department.

Accurate information is of the utmost importance to investors. *See e.g. Basic v. Levinson,* 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). Investment decisions based on incomplete or inaccurate information can result in substantial harm. *Id.* Therefore, the interests of the Unauthorized Individuals weigh in favor of denying preliminary injunctive relief.