N.B.A. CREDIT UNION, INC., Plaintiff,

v.

Sarah W. HARGROVE,
et al., Defendants.

Civ. A. No. 93–4826.

United States District Court,
E.D. Pennsylvania.

March 16, 1994.

James A. Backstrom, Vaira, Backstrom, Riley & Smith, Philadelphia, PA, for N.B.A. Credit Union, Inc.

Sue Ann Unger, Office of Atty. Gen., Philadelphia, PA, for Sarah W. Hargrove.

Richard Mentzinger, Jr., Office of U.S. Atty., Philadelphia, PA, Margaret H. Plank, Dept. of Justice, Civ. Div., Washington, DC, John K. Ianno, National Credit Union Admin., Alexandria, VA, for Roger W. Jepsen.

## MEMORANDUM/ORDER

KATZ, District Judge.

**AND NOW,** this 16th day of March, 1994, upon consideration of the Motion for Summary Judgment of Defendant Secretary of Banking Hargrove, the Federal Defendant's Renewed Motion for Summary Judgment, and Plaintiff N.B.A. Credit Union's Opposition To Motion for Summary Judgment of Defendant Secretary of Banking Hargrove and Federal Defendant's Renewed Motion for Summary Judgment, and after a hearing,[1] it is hereby **ORDERED** that the defen-

---

1. The depositions and supplemental submission submitted after the hearing do not change the substance of the presentation of the material issues at the hearing.

dants' respective motions for summary judgment are **GRANTED** as set forth below.

## I. Parties

Plaintiff, N.B.A. Credit Union, Inc. ("Credit Union"), is a non-profit Pennsylvania corporation chartered and regulated by the Pennsylvania Department of Banking (the "Pennsylvania Department"). Credit Union's members are affiliated through membership in the National Business Association, Inc. ("NBA"), an association of private and public employers and employees that acts as Credit Union's sponsor.[2] Defendant Sarah W. Hargrove ("Hargrove") is the Secretary of Banking of the Commonwealth of Pennsylvania. Hargrove is responsible for administration of the Pennsylvania Department, including regulation of Pennsylvania-chartered credit unions. 17 Pa.C.S.A. §§ 101–1504.

The National Credit Union Administration (the "NCUA") is an independent agency in the executive branch of the federal government. 12 U.S.C. § 1752a. Defendant Norman d'Amours ("Amours") is the appointed chairman of the board of the NCUA.[3] Credit Union is a federally-insured credit union subject to examination, supervision and regulation by the NCUA. 12 U.S.C. §§ 1752(7), 1784, 1786.[4]

## II. Background

This litigation concerns the defendants' regulation of Credit Union's field of membership. Credit Union claims that its geographic area of operation has been unjustly restricted. Credit Union claims that this action causes Credit Union to forego longstanding and valuable financial service relationships with members of NBA.

Credit Union was chartered on February 3, 1972 as D.V.B.A. Credit Union. Plaintiff's Proposed Exhibits 1 (filed for the preliminary injunction hearing and hereinafter "Pl Ex."). Credit Union assumed its present name on October 31, 1986, reflecting a change in its sponsor. France Dec. ¶ 3. At that time, Credit Union expanded its field of membership to include all members of NBA. Pl.Ex. 1–4; France Dec. ¶ 3. In March 1990, Credit Union provided services to employee groups[5] in approximately forty (40) states. Pl.Ex. 29, p. 1; France Dec. ¶ 11.

In September 1990, Credit Union and the Pennsylvania Department realized that their respective views of Credit Union's authorized field of membership differed. Pl.Ex. 5, 30; France Dec. ¶¶ 8–12.[6] Specifically, Credit Union operated under the view that its field of membership was constrained solely by Article 8 of its Amended Articles of Incorporation. This article reads in its entirety:

> The membership of the credit union will be limited to: Members of the National Business Association; associations of such persons; employees of the credit union; retired members who retain their membership in the credit union; and members of their immediate families.

---

2. The parties disagree as to the eligibility requirements for membership in NBA. This disagreement appears to be the result of either a failure to address the issue or to communicate clearly. *Compare* France Dec. ¶ 5 with Gary Mitchell Deposition pp. 222–223. The Pennsylvania Department believes that only employers may be members of NBA. *See e.g.,* France Dec. ¶ 5. Credit Union's position is that individuals as well as employers may be NBA members. *See e.g.,* Gary Mitchell Dep., pp. 222–223. This litigation concerns the Pennsylvania Department's geographic regulation on Credit Union membership. *See infra* pp. 391–92. While the dispute over NBA membership criteria illustrates the parties' communication difficulties, it is not necessary for this court to resolve.

3. Norman d'Amours has been substituted for Roger Jepsen as a party defendant to this action pursuant to Rule 25(d), Fed.R.Civ.P.

4. In performing their respective regulatory functions, the Pennsylvania Department and the NCUA routinely share information developed through separate and joint examinations of financial institutions organized as credit unions. *See e.g.,* Majka Dep., pp. 201–201.

5. The terms "employee group" and "employer group" are used interchangeably by the parties to refer collectively to Credit Union's depositors who share the same employer.

6. Credit Union notes that the defendants received complaints concerning Credit Union's field of membership from Credit Union competitors in New Jersey. Exhibits in Opposition to Motion for Summary Judgment 1 (hereinafter "Pl.Ex. in Op.").

Pl.Ex. 4. In contrast, the Pennsylvania Department held the view that "Pennsylvania State Chartered Credit Unions are restricted in membership to common associational groups within well defined community or rural districts in Pennsylvania." Pl.Ex. 5; France Dec. ¶¶ 8–9; 17 Pa.C.S. § 701. The NCUA, the Pennsylvania Department and Credit Union held several discussions concerning this conflict over Credit Union's authorized field of membership. These discussions culminated in an April 18, 1991 meeting between the Credit Union's Board of Directors, the Deputy Chief Counsel for the Pennsylvania Department, Mary D. France,[7] a representative of the Pennsylvania Department Bureau of Supervision and Enforcement, Victor H. Seesholtz, and representatives of the NCUA. Pl.Ex. 7; France Dec. ¶¶ 11–17.

### Order to Cease and Desist

At the April 18th meeting, the Pennsylvania Department presented a draft cease and desist order to Credit Union. France Dec. ¶¶ 18–19; Pl.Ex. 6–8. The draft order commented negatively on Credit Union's operations, addressed the disagreement over Credit Union's authorized field of membership, and attempted to settle several issues prospectively. *Id.* Credit Union objected to portions of the draft order and the Pennsylvania Department agreed to some modifications. *Id.;* Pl.Ex. 9.

On April 29, 1991, the Pennsylvania Department mailed Credit Union two documents: (1) a copy of the draft order that memorialized the modifications agreed to at the April 18, 1991 meeting; and (2) a joint Stipulation and Consent to Entry of Order to Cease and Desist. Pl.Ex. 10. On May 21, 1991, the Pennsylvania Department received an executed copy of the stipulation making final the Order to Cease and Desist (the "Order"). Pl.Ex. 14; *See* Joint Stip. of Facts (titled "Stipulation" and submitted for pre-

liminary injunction hearing, hereinafter referred to as "Stip.") Exs. A, B, C, D.

The Order stated that Credit Union expanded its field of membership beyond the parameters established by the Pennsylvania Department. Stip.Exs. A, B, C. With regard to day to day operations, the Order concluded that Credit Union:

(1) Along with its sponsor, NBA, conducted the business of Credit Union in an unsafe and unsound manner; and

(2) Is experiencing difficulties in record keeping and other areas of administration which may jeopardize the financial integrity of the Credit Union.

Stip.Ex. C. The Order also reported that "the Department has determined that the Board of Directors has not fulfilled its fiduciary duties or exercised reasonable care and due diligence in supervising operations of the Credit Union." *Id.; see also,* Kunyzka Dep. at 15–16.

Finally, the Order provided a definition of Credit Union's authorized field of membership. The Order defined Credit Union's authorized field of membership as follows:

The Credit Union shall limit its field of membership to members of NBA in the following geographic locations:

(a) the counties of Bucks, Chester, Philadelphia, Delaware and Montgomery, or elsewhere in the Commonwealth of Pennsylvania if prior authorization is granted by the Department pursuant to the requirements of Section 701(a) of the Code.

(b) the counties of Camden, Mercer, Gloucester and Burlington in the State of New Jersey, if prior authorization is obtained from the New Jersey Department of Banking; and

(c) the State of Delaware north of the Delaware Canal, if prior approval is obtained from [the appropriate state agency].[8]

---

7. Mary D. France was Deputy Chief Counsel of the Pennsylvania Department from January 1990 until January 1993. France Dec. ¶ 1.

8. The phrase "the appropriate state agency" was inserted by Department's unilateral modification

of the Order on June 13, 1991. The Order previously read:

(c) the State of Delaware north of the Delaware Canal if prior approval is obtained from NCUA.

Stip.Exs. A, B, C. Credit Union did not appeal this modification. France Dec. ¶ 23.

All individual members of the Credit Union and all business/employer members of the Credit Union enrolled as of May 1, 1991, not within the above described field of membership may remain members of the credit union [if not in violation of the law of the state in which the member is located.][9] No new employee members employed by existing business/employer members located outside the Commonwealth of Pennsylvania may be admitted to membership after May 1, 1991. No new business/employer members outside the field of membership may be admitted to membership after April 18, 1991.

Stip.Ex. C.[10] By stipulating to the Order, Credit Union waived its right to appeal the findings and determinations of the Order. Stip.Ex. C.

As directed by the Order, Credit Union sought authorization to operate in New Jersey from the New Jersey Department of Banking (the "New Jersey Department"). Pl.Exs. in Op. 5, 9–10; Pl.Ex. 17. Credit Union received a letter on August 8, 1991 from the New Jersey Department forbidding Credit Union from taking on "any new employee groups from the State of New Jersey" and permitting Credit Union to "service existing employees **throughout the State of New Jersey who are members of NBA, Inc. [including] adding new employees from the existing employee groups.**" *Id.* (emphasis added).

9. The phrase "if not in violation of the law of the state in which the member is located" was added by Department in the draft of the Order sent to Credit Union on April 29, 1991. Credit Union did not object to this modification. Stip.Exs. B, C, D; France Dec. ¶ 23.

10. The court notes that the phrase, "No new employee members employed by existing business/employer members located outside the Commonwealth of Pennsylvania may be admitted to membership after May 1, 1991," is inconsistent with provision (b) of the Order which all parties agree permits Credit Union accept new depositors from four New Jersey counties.

11. The parties disagree about the relevance of a depositor's residence. *N.B.A. Credit Union, Inc. v. Hargrove*, 834 F.Supp. 845, 849 n. 3 (E.D.Pa. 1993). The Pennsylvania Department's position is that current employer location is the only factor to be considered in determining depositor

**Present Controversy**

The present controversy centers on the parties differing views of Credit Union's authorized field of membership in New Jersey following the entry of the Order.

The Pennsylvania Department's position regarding New Jersey membership eligibility is that the Order authorizes Credit Union:

(1) To service existing employee groups within the four specified New Jersey counties (the "Four Counties") by retaining their depositors accounts **and** enrolling new depositors associated with existing employee groups;[11]

(2) To enroll new employee groups and their associated depositors from within the Four Counties; and

(3) To retain existing depositors from employee groups located outside the Four Counties (the "Grandfathered Employee Groups"), *but not to enroll new depositors from the Grandfathered Employee Groups under any circumstance,*

France Dec. ¶¶ 20, 25–27; Pl.Ex. 25 (emphasis added). The Pennsylvania Department also asserts that Credit Union's authorized field of membership **was further limited** by the New Jersey Department's unilateral determination that Credit Union was not authorized to enroll new employee groups from anywhere in New Jersey, including the Four Counties.[12] Pl.Ex. 17.

eligibility. *Id.* In other words, the depositor's residence is irrelevant. Credit Union argues that an employer's former location and depositor residence should be considered in determining eligibility. *Id.* Again, while this dispute provides an example of the parties' considerable communication difficulties, resolution of the instant matter does not require the court to address the disagreement over the function of residence in determining depositor eligibility.

12. The Pennsylvania Department's position is that the Order coupled with the determination of the New Jersey Department of Banking restricted Credit Union's field of operation in New Jersey to:

(1) servicing existing depositors throughout the state; and

(2) enrolling new depositors associated with existing employee groups from the Four Counties.

France Dec. ¶ 39.

Credit Union's position is that negotiations and correspondence with the Pennsylvania Department in the months prior to, and subsequent to, the entry of the Order, coupled with the New Jersey Department's authorization to enroll new employees from existing employee groups, resulted in complete authorization to enroll new depositors from the Grandfathered Employee Groups. Specifically, Credit Union contends that the issue of "fully servicing" new depositors of the Grandfathered Employee Groups was in flux in the months after the entry of the Order and the issue was settled by the New Jersey Department's August 8, 1991 letter permitting Credit Union to "service existing employees throughout the State of New Jersey who are members of NBA, Inc. [including] adding new employees from the existing employee groups." Pl.Ex. 17.

Thus, the present controversy over Credit Union's authorized field of membership centers on the eligibility of new depositors from the Grandfathered Employee Groups (the "New Depositors").

A review of the transcript of the April 18, 1991 meeting and the parties' communications following the entry of the Order sheds light on why the parties reached different positions regarding the eligibility of the New Depositors and why the misunderstanding was not resolved expeditiously.

During the April 18th meeting the following transcribed [13] colloquy occurred:

Mr. Mitchell: [14] One other question, I think it's clear but to make sure we all understand.

Ms. France: [15] Sure.

Mr. Mitchell: What you were—I think the word Commonwealth grandfather out of field membership, I believe you also said that with regard to New Jersey, you didn't have and issue. That's for New Jersey to decide. If somebody is in Middlesex County, for example and New Jersey has no objection to that employer signing up new employees that—

Ms. France: Well, New Jersey is going to know this is your field of membership and they are going to know what our order is. If they don't object to that, then that's the grandfathering. With this being your field of membership, that's—I think their problem.

Mr. Seesholtz: [16] I don't think that I have got authority to grant you exceptions to this in the State of New Jersey. It really gets me into an area where I have no authority. We are willing to cooperate as much as we can in Pennsylvania, but I think pushing to New Jersey is beyond what I can promise.

Mr. Mitchell: I understand I am asking to the extent that there is a major employer at the Department of Banking and New Jersey should be able to continue its members.

Ms. France: I don't want to let you know they are going to know that—we want to communicate.

Mr. Mitchell: Will they be sent a copy of this order?

Ms. France: No, not the order.

Mr. Seesholtz: You have got four counties in New Jersey which is really one more than the original charter contained because we looked at the map and Lou Ruch [17] had mentioned to us about Mercer being it includes Trenton and it is so close, that we felt it was a reasonable request. We expanded it to that much. I think that is reasonable.

Ms. France: We will write them and set forth this field of membership, and let them know kind of grandfathering or the exceptions or modifications of that have been from our Commonwealth. And then it is up to them to decide whether they want to hold you strictly to that field of membership or not.

---

13. Pennsylvania Department officials question the accuracy of the transcript. *See* France Dec. ¶ 30; Seesholtz Dep. p. 81.

14. Representing Credit Union.

15. Representing the Pennsylvania Department.

16. Representing the Pennsylvania Department.

17. Then, counsel for Credit Union.

Mr. Mitchell: You can't add new people to you old companies that are already in existence; is that what you are saying?

Ms. France: Right.

Mr. Seesholtz: That is up to the Department of Banking. To do what you did with regard to Commonwealth employer members is up to New Jersey, I assume.

Mr. Majka:[18] That's the understanding.

Pl.Ex. 7 (pp. 182–185). This exchange occurred prior to the entry of the Order, is subject to an array of interpretations and does not specifically address the eligibility of the New Depositors. *Id.*

Shortly after the execution of the stipulation to the Order, the Credit Union Board of Directors inquired of the Pennsylvania Department:

> On behalf of the Board of Directors of the NBA Credit Union, this letter is to express our concern that the Department of Banking and the NCUA may not have realized the full impact on the Credit Union of the Department's actions that would necessarily force or cause certain employer groups outside Pennsylvania to leave the Credit Union. In this regard we wish to inquire whether the Department of Banking or the NCUA considered or realized that in refusing the Board's request to **fully "grandfather" existing employer members of the Credit Union outside the Commonwealth of Pennsylvania (i.e., to allow the Credit Union to continue to admit new employee members from *existing* employers)** the Department's action would necessarily disrupt existing repayment arrangements . . .

18. Representing the NCUA.

19. In a contemporaneous letter to the New Jersey Department the Credit Union requested:
First we request your approval to continue the ability to **service and sign up** NBA members in the four New Jersey counties noted above [the Four Counties]. Second, we request your approval to **service** existing NBA employer groups throughout New Jersey.
Pl.Ex. in Op. 5 (emphasis added). This language is subject to the interpretation that signing up new depositors from the Four Counties was approved by the Pennsylvania Department subject to New Jersey's approval, but that Credit Union could only service existing New Jersey depositors outside the Four Counties and, under no circum-

Although we raised this concern with you at the April 18 meeting in asking that the Department reconsider the prohibition on admitting new employees of *existing* employer members outside the Commonwealth of Pennsylvania, Board members are so deeply concerned by the prohibition's impact, that we believe it warrants being expressed again in writing directly to [the Pennsylvania Department].

Stip.Ex. F (bold emphasis added) (underline emphasis in original). With respect to Credit Union's operations in New Jersey, the Credit Union Board's May 8th correspondence goes on to state:

> We also appreciate the Department's position set forth at the meeting that with regard to existing employer members in New Jersey, the Department believes that **any decision on the continued servicing of those employers** is a matter for the New Jersey Department of Banking. Nonetheless, based on the concerns noted in this letter, we ask that you similarly consider allowing the Credit Union to approach regulators in other states to request permission to continue to service those existing employer members . . . outside the Commonwealth.

Stip.Ex. F (emphasis added). The inquiry does not specifically address the eligibility of the New Depositors or differentiate between the employee groups from the Four Counties and the Grandfathered employee groups.[19]

The Pennsylvania Department responded to Credit Union's inquiry by a letter dated May 17, 1991.[20] Stip.Ex. G. That letter stated, in part:

stances, could sign up new New Jersey depositors from outside the Four Counties.

20. By letter dated May 16, 1991, which it appears was not before the Pennsylvania Department when it dispatched its May 17, 1991 response, Credit Union stated:
> . . . we want to inform you that at a meeting on May 14, 1991, the New Jersey Department of Banking has authorized the Credit Union to continue to service existing employer member groups in New Jersey, including adding new employees to those existing employer groups. This is the same arrangement that you have permitted us to have with regard to existing employer groups in the Commonwealth of Pennsylvania.

Although we recognize that restricting the credit union to a somewhat expanded, original authorized territory, will cause at least a temporary down-sizing of the organization, we do not believe the impact will do serious harm to the safety and soundness of the credit union.

Stip.Ex. G. The letter does not specifically address the status of the New Depositors or the Grandfathered Employee Groups. However, the letter does state:

For all the above reasons, your request to continue accepting new members at existing employers outside the authorized territory is hereby denied.

Stip Ex. G.

Credit Union's counsel responded to the Pennsylvania Department's May 17th letter by a letter dated June 11, 1991. The response renewed Credit Union's request to enroll new depositors from existing "out of state employer groups", but did not explicitly address the status of the Grandfathered Employee Groups or, in particular, the status of the New Depositors. Stip Ex. F. The Pennsylvania Department respond to Credit Union's June 11, 1991 letter by a letter dated July 17, 1991. With regard to Credit Union's New Jersey operations the July 17th letter stated:

In discussions with Bill Blunt of the New Jersey Department of Banking On May 1, 1991, I [Mary France] was informed that Credit Union would not be permitted to continue to operate in New Jersey. Please provide written verification that New Jersey has agreed to permit the Credit Union to retain existing employee groups.

Stip.Ex.G. Again, the letter does not draw an explicit distinction between new depositors from New Jersey employee groups located inside the Four Counties and the New Depositors. Id.

In September 1991, the Pennsylvania Department sent "a copy of the report of examination of the credit union prepared by Examiner Christine Lyon as of the close of business April 30, 1991" to Credit Union. Pl.Ex.

Pl.Ex. 12.

21. Timothy J. Blase was the Pennsylvania Department's Financial Institution examiner-in-

19. The letter accompanying the report clearly distinguishes the New Jersey employee groups located inside the Four Counties from the Grandfathered Employee Groups. Id. Specifically, the letter states:

The examiners noted that the "New Share Account Report" for the month of June, 1991, reflects the addition of many new members with addresses outside the credit union's authorized operating territory as defined in Paragraph # 4 of the Order, **which prohibited you from accepting members from other than Pennsylvania, specific counties of New Jersey, and Northern Delaware** after May 1, 1991. Please provide a response immediately for this apparent violation of the Order.

Pl.Ex. 19. Credit Union responded in a letter dated October 21, 1991. Pl.Ex. 20. With respect to the Pennsylvania Department's statement that Credit Union was prohibited from accepting the New Depositors, Credit Union's response did not distinguish between New Jersey employee groups located inside the Four Counties and the Grandfathered Employee Groups. Id. Credit Union's response reads, in pertinent part:

Both board and management are well aware that the credit union may not accept members from other than Pennsylvania, existing member companies in New Jersey as permitted by the New Jersey Department of banking, and northern Delaware after May 1, 1991.

Pl.Ex. 20.

Between May 1, 1991 and March 1992 Credit Union enrolled a significant number of New Depositors. Blase [21] Dec. ¶¶ 3–4; Pl Ex. 21. In March 1992, the Pennsylvania Department performed its annual examination of Credit Union and subsequently prepared a Report of Examination as of January 31, 1992, which was forwarded to Credit Union by letter of June 15, 1992. Pl.Ex. 21. That Report of Examination stated:

Recommendations made by the Department of Banking in the Cease and Desist

charge during the Pennsylvania Department's December 1992–January 1993 examination of Credit Union. Blase Dec. ¶ 1.

Order issued in April 1991, **appear to have been implemented by management since the last examination.** The field of membership was reviewed, and the credit union is only accepting new members from the counties detailed in the order and existing employer groups who were members of [NBA] prior to May 1, 1991.

Pl.Ex. 21.

Pennsylvania Department performed its next examination of Credit Union in December 1992 and January 1993 and prepared a Report of Examination as of October 31, 1992. Pl Ex. 23. That Report of Examination was forwarded to Credit Union by letter of April 5, 1993 and, in pertinent part, stated:

> *# 4 Field of Membership*—A comprehensive review of approximately 4,000 membership cards revealed that the credit union is still accepting new members of existing employer groups in the entire state of New Jersey. During the examination, approximately fifty new accounts were found to be apparent violation of this section of the Order. Management believes it is in compliance based on its interpretation of the transcript of the meeting when the original Order was signed combined with the letter from the New Jersey Department of Banking of August 9, 1991.... **The Pennsylvania Department of Banking limits the field of membership in New Jersey to the four counties of Camden, Mercer, Gloucester, and Burlington. This issue is unresolved as of the examination, and the remaining interpretational differences must be clarified and compliance requirements formalized in writing.**

Pl.Ex. 23 (bold emphasis added). By letter dated May 3, 1993, Credit Union responded:

> ... Based on discussions held with Department representatives at the time the Order was negotiated and entered, the credit union believed (and continues to believe) that the Department expressly acknowledged that whether or not to "grandfather" existing New Jersey employer

groups into the credit union's field of membership was an issue that the **Department believed legally was up to New Jersey authorities.**

Pl Ex. 24 (emphasis added). The Credit Union's response goes on to cite a May 16, 1991 letter to the Pennsylvania Department (Pl.Ex. 12). This letter asserts that, with regard to the Grandfathered Employee Groups and the New Depositors, the Pennsylvania Department deferred regulatory authority to the New Jersey Department. Pl. Ex. 24.

By letter dated July 26, 1993, the Pennsylvania Department notified Credit Union that its acceptance of the New Depositors was in "non-compliance with the Order". Pl.Ex. 25. This letter reviewed the language of the Order, refuted Credit Union's claim that regulation of Credit Union's New Jersey operations is solely a matter for the New Jersey Department, and mandated that Credit Union "limit its field of membership in New Jersey to [the Four Counties]." *Id.* In addition, the letter stated that deposits "received from members outside the field of membership are non-member deposits and consequently are not federally insured." *Id.*[22]

By letter dated August 19, 1993, the NCUA informed Credit Union that, as a result of the Pennsylvania Department's determination that deposits received from the New Depositors were unauthorized, such deposits were not federally insured. Pl.Ex. 26. The letter also stated NCUA's intent to notify the New Depositors of the uninsured status of their shares. *Id.*

On September 8, 1993, Credit Union commenced the instant action and moved this court to enjoin preliminarily the Pennsylvania Department and the NCUA from taking any action affecting or related to the membership status of employees or employer groups currently served by Credit Union and from withdrawing or interfering with the federal insurance of deposits in Credit Union. By Adjudication of October 14, 1993, this court denied Credit Union's motion for pre-

---

**22.** At that time the Pennsylvania Department estimated that Credit Union serviced 1900 New Depositors. Mem. of Law of Def. Hargrove in Opposition to Pl.'s Mot. for Preliminary Inj. p. 4. Presently, the Pennsylvania Department estimates that Credit Union services under 1500 New Depositors. Mot. for Summ.J. of Def. Hargrove p. 17.

liminary injunction. *N.B.A. Credit Union, Inc. v. Hargrove*, 834 F.Supp. 845 (E.D.Pa. 1993). After this court issued the Adjudication, the Pennsylvania Department and the NCUA informed Credit Union, the Grandfathered Employee Groups, and the New Depositors (post May 1, 1991) that the New Depositor's accounts were uninsured. Def. Hargrove Mot. for Summ. J., Exs. 4–6.

### III. Claims

Credit Union claims, on its own behalf and on behalf of its members, that the actions of the Pennsylvania Department and the NCUA constitute a violation of:

(a) Due Process under the Fifth and Fourteenth Amendments of the Constitution of the United States and under Article V, Section 9 of the Pennsylvania Constitution. Complaint ¶¶ 58–64;

(b) the liberty and property interests guaranteed by the Fifth and Fourteenth Amendments of the Constitution of the United States and under Article V, Section 9 of the Pennsylvania Constitution. *Id.* ¶¶ 65–67;

(c) the Commerce Clause, Article I, Section 8, Clause 3 of the of the United States Constitution. *Id.* ¶¶ 68–75;

(d) the Privileges and Immunities Clause of Article IV, Section 2 of the Constitution of the United States. *Id.* ¶¶ 76–80; and

(e) Pennsylvania state law. *Id.* ¶¶ 81–84.

### IV. Summary Judgment Standard

■ Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c). At the summary judgment stage, the court does not weigh the evidence and determine the truth of the matter. Rather it determines whether or not there is a genuine issue for trial.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The moving party has the burden of showing there are no genuine issues of material fact, *Gans v. Mundy*, 762 F.2d 338, 340–41 (3d Cir.), *cert. denied*, 474 U.S. 1010, 106 S.Ct. 537, 88 L.Ed.2d 467 (1985), and the non-moving party may not rely merely upon bare assertions, conclusory allegations or suspicions. *Fireman's Ins. Co. of Newark v. DuFresne*, 676 F.2d 965, 969 (3d Cir.1982).

### V. Analysis

■ Credit Union brings this action in its own right and on behalf of its members. This raises the threshold issue of Credit Union's standing to assert the claims of its members. In this instance, the interests of Credit Union and its members are not coextensive. Credit Union has a business interest in retaining the New Depositors as customers. On the other hand, the members chief interest is that their deposits and loans are securely administered. Given the circumstances, the New Depositors[23] may wish to terminate their relationship with Credit Union and establish a secure relationship with another financial institution, and the Credit Union members that are clearly within the authorized field of membership may prefer that Credit Union concentrate its resources on servicing their accounts. Credit Union does not have standing to assert the claims of its members in the instant action. *See Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977).

### Federal Claims

The court will address Credit Union's federal claims *in seriatim*.

### Procedural Due Process

■ Credit Union claims that it has been deprived of a constitutionally protected interest in servicing the New Depositors without procedural due process. Specifically, Credit

---

**23.** The NCUA asserts that the New Members *are not members* of Credit Union and, therefore, Credit Union does not have standing to assert their claims. In this instance, the court is not required to determine whether Credit Union may assert the claims of individuals whose member-ship status is dependent on the outcome of such claims. Regardless of membership status, the divergence in interest is such that Credit Union does not have standing to assert the claims of it members or prospective members.

Union claims a protected interest in its business association with the New Depositors.

■ The predicate for requiring a governmental entity to comply with the rudiments of procedural due process is a determination that some constitutional interest is at stake. *Stana v. School Dist.*, 775 F.2d 122, 125 (3d Cir.1985).

■ To have a constitutionally protected property interest, there must be a legitimate claim of entitlement. *Stana*, 775 F.2d at 126. While a clearly implied promise can give rise to a constitutionally protected property right, *Connell v. Higginbotham*, 403 U.S. 207, 91 S.Ct. 1772, 29 L.Ed.2d 418 (1971), a person must have more than a unilateral expectation that such an entitlement exists. *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). The present record does not establish a clear promise giving rise to a legitimate claim of entitlement. Rather, viewing the record in the light most favorable to Credit Union, the parties' negotiations preceding the Order and their communications thereafter created an ambiguity regarding the membership eligibility of the New Depositors. Credit Union responded aggressively to this ambiguity. Credit Union did not seek explicit clarification of the issue or ratification of its aggressive interpretation from the Pennsylvania Department.

Credit Union cannot derive a property right in servicing the New Depositors entitled to due process protection without demonstrating a clear meeting of the minds between itself and the Pennsylvania Department. *See Stana*, 775 F.2d at 125–126. Credit Union has failed to demonstrate the existence of a material fact that such a clear mutual understanding between Credit Union and the Pennsylvania Department existed.

The crux of Credit Union's due process claim is that it was clearly entitled to treat all existing New Jersey employee groups alike. However, in defining the Credit Union's authorized field of operation, the sole official document detailing Credit Union's authorized field of membership, the Order,[24] explicitly distinguishes between the Four Counties and the remainder of New Jersey.[25] This distinction was not explicitly addressed in Credit Union's subsequent communications with the Pennsylvania Department and there is no indication in the record that the Pennsylvania Department clearly waived the significance of the distinction. Likewise, given the Order's explicit prohibition on the acceptance of deposits from "out of field" employee groups including the New Depositors,[26] there is no indication that the Pennsylvania Department clearly conditioned the operative effect of that prohibition on the subsequent actions of the New Jersey Department.

The record demonstrates the parties' difficulty in squarely addressing their differing interpretations of the Order. *See supra* p. 389 n. 2; pp. 392–95. This difficulty in communication lends further support to the conclusion that plaintiff cannot demonstrate a genuine issue of material fact that a clear mutual agreement permitting Credit Union to accept deposits from the New Depositors existed.

There is no indication that the Pennsylvania Department clearly adopted Credit Un-

---

**24.** During the April 18, 1991 meeting the following description of the proposed Order to Cease and Desist was transcribed:

> Ms. France: ... we have adopted some of your suggestions but not all of them, which I am sure is what you expected. This is our order. This is not a contract. So a lot of the way that things started is the way that we see them. When you sign the stipulation, you expressly say we disagree with your department but we will do these things.
> Pl.Ex. 7 p. 164.

**25.** The hypothetical discussions at the April 18, 1991 meeting, see *supra* pp. 392–93, which oc-

curred prior to the entry of the Order and did not clearly address the Order's distinction between employee groups from the Four Counties and the Grandfathered employee groups, cannot support a finding that the distinction between the groups was clearly waived *and* that it was clearly waived in favor of Credit Union.

**26.** As discussed *supra*, pp. 390–91 the Order states:

> No new employee members employed by existing business/employer members located outside the Commonwealth of Pennsylvania may be admitted to membership after May 1, 1991.
> Stip.Ex. C.

ion's aggressive view regarding the New Depositors. For example, when the New Jersey Department chose to regulate Credit Union's New Jersey employee groups without differentiating between the Four Counties and the remainder of the state, Credit Union did not seek clear confirmation from the Pennsylvania Department that it could service all New Jersey employee groups equally (i.e., that the Order's distinction between the Four Counties and the remainder of the state was insignificant).

The fact that the Report of Examination as of January 31, 1992 did not recognize that Credit Union was treating all New Jersey employee groups alike does not raise a material issue of fact that there was a clear agreement regarding the eligibility of the New Depositors.

■ Credit Union also argues that summary judgment is inappropriate because property interests may derive from an "estoppel claim or other binding understanding or tacit agreements cognizable under state law or a common law doctrine whether written, oral or based on conduct." Pl. N.B.A. Credit Union's Opposition to Mot. for Summ. J., p. 26 (quotations omitted) (citing *Regents of the Univ. of Michigan v. Ewing*, 474 U.S. 214, 223–24 & n. 9, 106 S.Ct. 507, 512–13 & n. 9, 88 L.Ed.2d 523 (1985)); *see also*, Pl.Exs. in Op. 13, 23; Blase Dep. pp. 74–75. However, Credit Union has not shown a material issue of fact that the Pennsylvania Department clearly agreed, in writing, orally or by conduct, to permit Credit Union to go beyond the plain language of the Order and service the New Depositors. Further, while estoppel may run against Pennsylvania state agencies, citizens "must turn square corners when they deal with the Government." *Department of Public Welfare v. UEC, Inc.*, 483 Pa. 503, 397 A.2d 779, 785 (1979) (citing *Rock I., Ark. and La. R.R. v. United States*, 254 U.S.

141, 41 S.Ct. 55, 65 L.Ed. 188 (1920)). The patent ambiguity in the communications between the parties precludes Credit Union from establishing a genuine issue of material fact that the Pennsylvania Department clearly stated that the New Depositors were authorized to become members of Credit Union. *Id.* 397 A.2d at 785 n. 6 ("[m]istaken indulgence by, or errors of, the Commonwealth" do not operate as a waiver of regulations).

The failure of the Pennsylvania Department to immediately recognize upon audit [27] the inconsistency between Credit Union's acceptance of the New Depositors and the language of the Order cannot operate as a clear waiver of the Order's prohibition against acceptance of the New Depositors or estop the Pennsylvania Department's enforcement of the Order.[28] *See UEC*, where the court stated:

> Our holding today does not affect the validity of *Commonwealth v. Western Maryland R.R. Co.*, 377 Pa. 312, 105 A.2d 336 (1954) and cases of similar ilk … [in *Western Maryland*] We held that failure to collect the tax in the past is no bar to present collection. Mistaken indulgence by, or errors of, the Commonwealth in the past do not insulate the taxpayer from tax liability in subsequent years.

*UEC*, 397 A.2d at 785 n. 6; *see also, Investments, Inc. v. Kemp*, 746 F.Supp. 807 (N.D.Ill.1990).

There is simply no threshold showing of reasonable reliance on the oral representations of the regulators.

### Substantive Due Process

Credit Union asserts that the defendants' actions are violative of Credit Union's substantive due process rights.

---

27. The court also notes that justifiable reliance is an essential element of an estoppel claim. It is undisputed that Credit Union began enrolling the New Depositors almost immediately after receiving authorization from the New Jersey Department to operate in New Jersey. Thus, for Credit Union's claim of estoppel to be logical, the alleged clear misrepresentation by the Pennsylvania Department must be shown to have occurred at the time the Order was entered. *Lovell Manu-* *facturing v. Export–Import Bank of the United States*, 777 F.2d 894 (3d Cir.1985).

28. Credit Union also claims a liberty interest in its business association with the Unauthorized Individuals. Again, a misunderstanding cannot give rise to a constitutionally protected liberty interest. *See Roth*, 408 U.S. at 572–576, 92 S.Ct. at 2706–08.

Regulations do not violate substantive due process if they are rationally related to a legitimate state interest. *Midnight Sessions Ltd. v. City of Philadelphia*, 945 F.2d 667, 682 (3d Cir.1991). Substantive due process protects solely against government actions that are not within the legitimate purview of the state's power. *Sinaloa Lake Owners Ass'n v. City of Simi Valley*, 882 F.2d 1398, 1409 (9th Cir.1989), *cert. denied*, 494 U.S. 1016, 110 S.Ct. 1317, 108 L.Ed.2d 493 (1990). The Pennsylvania Department has the power to define Credit Union's field of operation. 17 Pa.C.S.A. § 701. The NCUA has no authority to insure accounts outside Credit Union's field of operation. 12 U.S.C. § 1781. Therefore, to prevail, Credit Union must establish that the Department's regulation of Credit Union's field of operation bears no rational relation to a legitimate state interest. The Pennsylvania Department asserts that restricting credit union fields of operation enhances the cooperative nature of credit unions and ensures the "the conduct of business of credit unions on a safe and sound basis." Def. Hargrove Mot. for Summ. J., pp. 34–36; 17 Pa.C.S.A. § 503. Credit Union has not established the existence of an issue material fact that the defendants' actions have no rational relation to a legitimate state interest.

## Commerce Clause

Credit Union claims that the defendants' actions are violative of the Commerce Clause.

State laws that unreasonably burden interstate commerce are at odds with the commerce clause, United States Constitution, Article I, Section 8. *See Lewis v. BT Investment Managers, Inc.*, 447 U.S. 27, 36, 100 S.Ct. 2009, 2015, 64 L.Ed.2d 702 (1980). However, so long as a state regulates even-handedly to effectuate a legitimate local public interest, and the effects on interstate commerce are incidental, its regulation will be valid, unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970).

The Pennsylvania statute governing credit union field of membership provides:

Credit Union organizations shall be limited to groups having a potential membership of 500 or more adult persons and having a common bond of association within a well-defined community or rural district. . . .

17 Pa.C.S. § 701. This statute does not differentiate between intrastate and interstate associations. The field of membership definition in the Order allows Credit Union to "fully" operate in portions of Pennsylvania, New Jersey and Delaware, subject to approval from the New Jersey Department and the corresponding Delaware agency.

Credit Union has not established an issue of material fact that the Pennsylvania Department's actions have unreasonably burdened Credit Union's ability to compete in the market for depositors within its field of membership or that the Pennsylvania Department's restrictions on the scope of credit union operations to well defined areas burdens commerce excessively in relation to the benefits derived from such restriction. *See, Pike*, 397 U.S. at 142, 90 S.Ct. at 847.

## Privileges and Immunities Clause

Credit Union claims that its members rights under the Privileges and Immunities Clause have been violated by the defendants' actions. Credit Union does not have standing to assert these claims. *See supra* pp. 396–97. Further, even if Credit Union could assert the claims of its members, summary judgment in favor of the defendants would nevertheless be appropriate.

In its broadest sense the Privileges and Immunities Clause mandates that citizens of one state who are subject to the regulation of second state be treated equally to the second state's citizens in matters "bearing on the vitality of the Nation as a single entity." *Baldwin v. Fish and Game Comm'n*, 436 U.S. 371, 383, 98 S.Ct. 1852, 1860, 56 L.Ed.2d 354. There is no question that individuals inside Credit Union's authorized field of operation are treated similarly and without regard to their state citizenship. Likewise, individuals outside Credit Union's authorized field of operation are treated similarly and without regard to their state citizenship. Moreover, given the number and breadth of

choices available in the market for financial services, membership in Credit Union is not a matter bearing on the vitality of the Nation as a single entity. *Id.*

Finally, the fact that a relatively small portion of Credit Union's authorized field of membership is drawn along state lines [29] does not give rise to a Privileges and Immunities Clause violation. *Cf. United Bldg. and Constr. Trades Council of Camden v. Mayor and Council of Camden,* 465 U.S. 208, 222, 104 S.Ct. 1020, 1029, 79 L.Ed.2d 249 (1984).

### State Claims

■ There are no viable federal claims in the instant action. On balance, considerations of judicial economy, convenience and fairness to the litigants do not support the exercise of supplemental jurisdiction over Credit Union's state law claims. *Growth Horizons, Inc. v. Delaware County,* 983 F.2d 1277, 1284 (3d Cir.1993); 28 U.S.C. § 1367. No trial on the Credit Union's federal claims is necessary. The regulation of the Credit Union raises complex state law issues. Accordingly, the plaintiff's state law claims will be dismissed without prejudice. 28 U.S.C. § 1367(c)(1), (3).

---

**29.** The Order "fully grandfathers" all existing Pennsylvania employee groups, but "fully grandfathers" only the New Jersey employee groups within the Four Counties.